**EXHIBIT 2**

Bauer v. Morton's of Chicago, Not Reported in F.Supp.2d (2000)
82 Fair Empl.Prac.Cas. (BNA) 286

2000 WL 149287
United States District Court,
N.D. Illinois, Eastern Division.

Louise J. BAUER, Plaintiff,
v.
MORTON'S OF CHICAGO, Defendant.

No. 99 C 5996. | Feb. 9, 2000.

## MEMORANDUM OPINION AND ORDER

ANDERSEN, District J.

**\*1** This case is before the court on the motion of defendant, Morton's of Chicago ("Morton's") to dismiss plaintiff Louise J. Bauer's complaint pursuant to Fed.R.Civ.P 12(b)(1) and 12(b)(3), or, in the alternative, to compel arbitration pursuant to Section 2 of the Federal Arbitration Act ("FAA"). For the reasons stated below, we grant the motion to dismiss and to compel arbitration.

## BACKGROUND

On October 29, 1992, Bauer began working for Morton's. As a condition of her employment, Bauer signed a handbook receipt in 1992, 1993, 1997, and 1998 acknowledging that she had received and read a copy of management's guidelines and agreed to abide by its terms and any revisions made thereafter.

At some point after Bauer began employment in 1992, but before February 13, 1998, Morton's added a Mandatory Arbitration Policy And Procedure For Resolving Disputes Arising Out Of Its Employment ("Arbitration Policy") as part of its employees' agreements for continued employment. This Arbitration Policy includes the following arbitration clause:

> In the event of any dispute, claim, or controversy including, but not limited to, any dispute, claim, or controversy seeking compensatory and/or punitive damages ("claims")arising out of any Employee's employment or cessation of such employment with Morton's of Chicago, Inc. ("Morton's"), any such claims, on an individual or class basis, shall be submitted to final

and binding arbitration. Such claims include, but are not limited to, any federal, state, or local statutory claims (including... claims pursuant to Title VII of the Civil Rights Act of 1964, as amended...)

On February 13, 1998, Bauer signed an Arbitration Policy Receipt acknowledging that she has received and read the Arbitration Policy. In the Arbitration Policy Receipt, Bauer agreed that she understood this Arbitration Policy superseded any other agreement she may have regarding her employment with Morton's. On April 1, 1999, Bauer was discharged from her employment with Morton's.

On September 10, 1999, Bauer filed this four count action alleging that she was subjected to gender discrimination, a hostile work environment, and retaliation for complaining about the harassment and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991.

## DISCUSSION

A motion to dismiss a complaint does not test whether the plaintiff will prevail on the merits, but instead whether the plaintiff has properly stated a claim. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). In deciding a motion to dismiss, the court must assume all facts alleged in the complaint to be true, construe the allegations liberally and view the allegations in the light most favorable to the plaintiff. *Wilson v. Formigoni,* 42 F.3d 1060, 1062 (7th Cir.1994). Dismissal is properly granted if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Cushing v. City of Chicago,* 3 F.3d 1156, 1159 (7th Cir.1993).

**\*2** As a preliminary matter, we note that arbitration agreements are governed by the FAA which provides that an arbitration clause "shall be valid, irrevocable, and enforceable save upon such grounds as exist in law or equity for the revocation of any contract ." 9 U.S.C. § 2. The FAA's purpose is to "reverse the long-standing judicial hostility to arbitration agreements... and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24 (1991). Accordingly, courts must give due regard to the federal policy favoring arbitration and resolve ambiguities as to the scope of the arbitration clause

in favor of arbitration. *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 524 U.S. 52 (1994).

**I.** *Bauer's Agreement to Arbitrate Is Enforceable*
In order to determine whether a claim is arbitrable, we must determine: 1) whether there is an agreement to arbitrate; 2) whether the claims fall within the scope of the agreement; and 3) whether there has been a waiver. *Gilmer,* 500 U.S. at 24–34.

**A.** *An Enforceable Agreement to Arbitrate Exists*
Bauer agreed to arbitration when she signed the Arbitration Policy Receipt. Bauer, however, argues that the Arbitration Policy is unenforceable because it is not supported by sufficient consideration.

In support of her argument, Bauer relies on the Illinois Supreme Court ruling in *Doyle v. Holy Cross Hospital,* 186 Ill.2d 104, 708 N.E.2d 1140 (1999). In *Doyle,* the defendant issued employees a handbook including provisions for separation from employment. The defendant, years later, added disclaimers providing that the employees are now "at-will" employees, subject to termination at any time. The plaintiff claimed that the new provisions regarding employment should be invalidated because the defendant unilaterally altered the handbook to the employee's disadvantage without sufficient consideration. The court held that:

> Because the defendant was seeking to reduce the rights enjoyed by the plaintiffs under the employee handbook, it was the defendant, and not the plaintiffs, who would properly be required to provide consideration for the modification. But in adding the disclaimer to the handbook, the defendant provided nothing of value to the plaintiffs and did not itself incur any disadvantage. In fact, the opposite occurred: the plaintiffs suffered a detriment the loss of rights previously granted to them by the handbook while the defendant gained a corresponding benefit. *Doyle,* 186 Ill.2d at 112.

In the instant case, the ruling in *Doyle* does not apply. The Arbitration Policy is not attempting to change unilaterally any existing contract between Bauer and Morton's. Further, any arguably unilateral change that may have been made does not disadvantage Bauer nor lead her to suffer some detriment that Morton's does not suffer. In fact, in a similar case, the Seventh Circuit found sufficient consideration from the fact that both parties agreed to arbitrate with each other. *Michalski v. Circuit City Stores, Inc.,* 177 F.3d 634, 637 (7th Cir.1999). In that case, the Court held that the signature of an employee to be bound by arbitration in the same agreement to which the employer agrees to be bound by the same arbitration agreement clearly indicated a mutual promise, binding on both parties, and thus is sufficient consideration. *Id.*

**\*3** Similarly, in this case, Bauer signed an agreement to be bound to the Arbitration Policy. The language used in the Arbitration Policy unambiguously points out that each party is bound by the same arbitration terms. The Arbitration Policy continuously uses the phrase "each party" when explaining the rights, procedures, and terms of the policy. The use of these phrases clearly establishes a mutual promise between Bauer and Morton's. Thus, Bauer suffers no disadvantage or reduction of rights, and we find that the Arbitration Policy is supported by sufficient consideration. Therefore, an enforceable agreement to arbitrate is present in this case.

**B.** *Bauer's Employment Claims Fall Within the Scope of the Arbitration Policy*
Second, we examine whether Bauer agreed to arbitrate the specific claims presented in her complaint. At the time Bauer signed the Arbitration Policy Receipt, the Arbitration Policy contained the clause:

> In the event of any dispute, claim, or controversy including, but not limited to, any dispute, claim, or controversy seeking compensatory and/or punitive damages ("claims") arising out of any Employee's employment or cessation of such employment with Morton's of Chicago, Inc. ("Morton's"), any such claims, on an individual or class basis, shall be submitted to final and binding arbitration. Such claims include, but are not limited to, any federal, state, or local statutory claims (*including... claims pursuant to Title VII of the Civil Rights Act of 1964 as amended...*) (emphasis added).

The claims raised in this lawsuit relate solely to Bauer's employment and the termination of her employment with Morton's. Therefore, Bauer's claims arise out of her "employment or the cessation of such employment with Morton's" and involve an alleged violation of Title VII. Thus, Bauer's claims fall within the scope of the Arbitration Policy, and Bauer specifically has agreed to arbitrate these claims.

### C. *There Has Been No Waiver of the Right to Arbitrate*
The final element in determining whether a claim is arbitrable is to determine whether there has been a waiver of the right to arbitrate. In this case, there has been no such waiver, nor does any party argue that a waiver has occurred. Therefore, all of the elements necessary for Bauer's claims to be arbitrable have been met.

### II. *Arbitration Does Not Deprive Bauer of Procedural Rights*
Bauer argues that compulsory arbitration unfairly deprives her of a right to a jury trial for her Title VII claims. The Supreme Court in *Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 29 (1991)*, has rejected this argument. The *Gilmer* Court concluded that compulsory arbitration of an Age Discrimination in Employment Act ("ADEA") claim does not deprive the plaintiff of the right to proceed in a judicial forum. *Id.*

Moreover, numerous courts have concluded that Title VII claims, like ADEA claims, also can be subjected to compulsory arbitration. *See, e.g., Koveleskie v. S.B.C. Capital Markets, Inc., 167 F.3d 361, 365 (7th Cir.1999); Michalski v. Circuit City Stores, Inc., 177 F.3d 634 (7th Cir.1999); Bender v. A.G. Edwards & Sons, Inc.,* 974 F.2d 698, 700 (11th Cir.1992*); Alford v. Dean Witter Reynolds, Inc., 939 F.2d 229, 230 (5th Cir.1991); Willis v. Dean Witter Reynolds, Inc., 948 F.2d 305, 309 (6th Cir.1991).* We agree with the position of these courts. Therefore, we reject Bauer's argument that mandatory arbitration deprives her of procedural rights.

### CONCLUSION

**\*4** For the foregoing reasons, we grant the motion of defendant, Morton's of Chicago, to dismiss the plaintiff's complaint and compel arbitration. This is a final and appealable order.

It is so ordered.

### All Citations

Not Reported in F.Supp.2d, 2000 WL 149287, 82 Fair Empl.Prac.Cas. (BNA) 286

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 2325688
United States District Court,
N.D. Illinois, Eastern Division.

Vicki Nano DALOPE, Plaintiff,
v.
UNITED HEALTH CARE OF
ILLINOIS, Sally Blomquist, Defendants.

No. 03 C 8918. | Oct. 8, 2004.

**Attorneys and Law Firms**

Arcadio A. Joaquin, Jr., Chicago, IL, for Plaintiff.

Joseph S. Turner, Keri B. Halperin, Seyfarth Shaw, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

BUCKLO, J.

**\*1** Plaintiff Vicky Nano Dalope was employed as a support services clerk for defendant United Healthcare of Illinois ("UHC") from April 11, 1988 until her termination on November 10, 2000. Ms. Dalope alleges that UHC terminated her on the basis of her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") and that UHC and Sally Blomquist, Ms. Dalope's former supervisor, failed to reasonably accommodate Ms. Dalope's physical disabilities in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). UHC now moves to dismiss or, in the alternative, stay this proceeding and compel arbitration of Ms. Dalope's claim based on UHC's Employment Arbitration Policy. I GRANT the motion to compel arbitration and DISMISS the complaint without prejudice.

The Federal Arbitration Act ("FAA") provides that "[a] written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under the FAA, once I am satisfied that the making of the agreement to arbitrate is not in issue, I must order the parties to proceed to arbitration in accordance with their agreement. *Schacht v. Beacon Ins. Co.,* 742 F.2d 386,

388 (7th Cir.1984). Whether the parties agreed to arbitrate is a matter of state contract law. *Tinder v. Pinkerton Sec.,* 305 F.3d 728, 733 (7th Cir.2002). Here, Illinois contract law controls. *Id.*

The parties agree that the complete terms of the arbitration agreement are set forth in three inter-related documents, which are attached to UHC's motion: the UHC Code of Conduct and Employee Handbook Acknowledgement ("Acknowledgement") form signed by Ms. Dalope on August 20, 1997, excerpts from the UnitedHealth Group ("UHG")[1] Employee Handbook ("Handbook") summarizing UHG's Dispute Resolution policies, and UHG's Employment Arbitration Policy ("EAP").[2] Ms. Dalope admits having received, read and understood these documents. The Acknowledgement reads, in relevant part, "I understand that arbitration is the final, exclusive and required forum for the resolution of all employment related disputes which are based on a legal claim. I agree to submit all employment related disputes based on a legal claim to arbitration under UHC's policy." Both the EAP and the summary thereof contained in the Handbook explicitly include within their definition of a legal claim any dispute that "arises or involves a claim under ... the Age Discrimination in Employment Act ... [or the] Americans with Disabilities Act."

Ms. Dalope does not deny that a contractual relationship existed between herself and UHC with respect to the arbitration agreement, nor does she argue that her claims are not subject to the FAA. Nonetheless, she argues that UHC should not be permitted to enforce the arbitration agreement because it has failed to exhaust its own IDR process before seeking arbitration. Plaintiff's argument assumes the parties were mutually obligated to exhaust the IDR process before either could pursue arbitration. I find this argument neither accurate nor persuasive. Absent some ambiguity in the agreement, it is the language of the contract that defines the scope of disputes subject to arbitration. *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 289, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002). The Acknowledgement signed by Ms. Dalope makes clear that "the provisions of the [Employee] Handbook are guidelines and *except for the provisions of the Employment Arbitration Policy,* do not constitute a contract or any particular terms or condition of employment ..." (emphasis added). The language of the EAP concerning IDR clearly reflects its voluntary and separate character: "employees are *encouraged* to exhaust the IDR process before proceeding to arbitration." Moreover, Ms.

Dalope's argument misconstrues the obligations of the parties with respect to the IDR process. The language of the IDR policy indicates that employees must initiate the process, not the employer. UHC's obligation to follow the procedures set forth in its IDR policy are triggered by the employee's actions in submitting a claim. UHC is not obligated to initiate the IDR process prior to seeking arbitration.

**\*2** Ms. Dalope further contends that because she was terminated, she could not avail herself of the IDR process and is therefore not bound to arbitrate. However, the IDR policy explicitly provides for a mechanism for terminated employees to appeal their termination by submitting a written appeal within 20 days after termination. Ms. Dalope chose not to avail herself of this process; she cannot now use that choice as a shield against her agreement to arbitrate.

Ms. Dalope next argues that the EAP ceased to be binding once her employment with UHC ended. The express language of the both the EAP and the Arbitration Policy section of the Handbook clearly indicate in their scope of policy sections that a dispute is subject to the arbitration policy if it arises or involves a claim regarding or relating to termination of employment. The EAP also clearly defines the term employee to include both current and former employees of UHG. Obviously, a dispute over termination would not be litigated while an employee is still employed by UHC. *See, e.g., Johnson v. Travelers Property Casualty,* 56 F.Supp.2d 1025, 1026 (N.D.Ill.1999). Ms. Dalope entered into a valid agreement with UHC to submit any employment disputes based on a legal claim to arbitration and all of the claims

raised in her complaint are subject to that agreement. I GRANT UHC's motion to compel arbitration of these claims.

The last issue is whether the appropriate disposition of this matter is to dismiss the complaint or stay the proceeding in accordance with 9 U.S.C. § 3. Because all issues raised in this action must be submitted to arbitration, retaining jurisdiction and staying the action will serve no purpose. Any post-arbitration remedies sought by the parties would be limited to a judicial review of the arbitrator's award. *Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir.1992); *see* 9 U.S.C. § 9–12. Although the Seventh Circuit has not directly addressed this issue, "[t]he weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration." *Green v. Ameritech Corp.,* 200 F.3d 967, 973 (6th Cir.2000) (citing *Alford* at 1164). *See also e.g., Hostmark Investors, Ltd. v. Geac Enterprise Solutions, Inc.,* 2002 WL 1732360 \*3 (N.D.Ill. July 26, 2002) (dismissing complaint without prejudice where all issues were subject to arbitration); *Reineke v. Circuit City Stores, Inc.,* 2004 WL 442639\*5 (N.D.Ill. Mar.8, 2004) (same); *U.S. International Travel & Tours, Inc. v. Tarom S.A.S.C. Compania Nationala De Transporturi Aeriene Romane,* 98 F.Supp.2d 979, 981 (N.D.Ill. May 26, 2000) (same). Consequently, rather than stay these proceedings pending arbitration, I DISMISS this case without prejudice.

## All Citations

Not Reported in F.Supp.2d, 2004 WL 2325688, 29 NDLR P 51

## Footnotes

1    UnitedHealth Group is the parent company of UHC.

2    The Handbook excepts and EAP, as attached, do not appear to be a part of the 1997 agreement. The documents indicate that they were revised as of April 2001 and March 2002, respectively, well after Ms. Delope had been terminated. There is no indication, from the documents themselves or from the affidavit authenticating them, which terms had been revised and which were included in the documents as they were provided to Ms. Delope. However, those discrepancies are mooted by Ms. Delope's admission that these documents were received, read, and understood by her.

---

2009 WL 2475222
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Dorothy LEVEY and Moses Hyles, Plaintiffs,
v.
CITIMORTGAGE, INC. and
Mark Diamond, Defendants.

No. 07 C 2678.   |   Aug. 10, 2009.

West KeySummary

**1**   **Civil Rights**

👉   **Loans and Financing**

Mortgagee failed to allege any facts which might be construed to state a claim against mortgage company under the Fair Housing Act for race discrimination. All of mortgagee's allegations of wrongdoing were directed at broker and various entities with whom he was associated. Further, mortgagee averred in his complaint that mortgage company was not present at the closing of the mortgage and did not allege that mortgage company had any involvement at all with settling the terms of the mortgage. Fair Housing Act, § 801, 42 U.S.C.A. § 3601; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**Attorneys and Law Firms**

William F. Spielberger, William F. Spielberger & Associates, P.C., Chicago, IL, for Plaintiffs.

James Vincent Hart, Lucia Nale, Mayer Brown LLP, Dennis E. Both, Brown, Udell, Pomerantz and Delrahim, Chicago, IL, for Defendants.

*MEMORANDUM OPINION & ORDER*

JOAN B. GOTTSCHALL, District Judge.

**I. BACKGROUND**

**\*1**   Defendant CitiMortgage has filed a motion to dismiss Dorothy Levey and Moses Hyles' Fourth Amended Complaint (the "Complaint"), [1] which alleges violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601-19, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-91f. Compl. ¶ 1. Plaintiffs additionally bring a statutory claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), and Illinois common law claims of unconscionability and breach of fiduciary duty under the court's supplemental jurisdiction. *See* Compl. Hyles' claims are brought against Mark Diamond, the individual who allegedly perpetrated the fraud against him, and CitiMortgage, Inc., the assignee of the loan brokered by Diamond and originally funded at closing by Delta Funding Corporation ("Delta"). Levey's claims are brought against CitiMortgage, the reputed assignee of a loan originated by BNC Mortgage (the "BNC Loan"). *Id.*

In the Complaint Hyles specifically alleges that after entering into a series of loans over several years to pay various expenses he received a number of telephone calls from a representative of Diamond's firm inquiring whether Hyles wished to refinance his existing loan in order to have "extra money" to "re-do [his] bathroom and ... kitchen." Compl. ¶¶ 27, 28. Subsequently, Diamond introduced Hyles and his wife to the mortgage lender Delta. Compl. ¶ 32. Hyles and his wife entered into a mortgage agreement (the "Mortgage") with Delta, the proceeds of which Hyles claims he never received. Compl. ¶¶ 30, 35. At an unspecified time the Mortgage was assigned to CitiMortgage, which is currently collecting on it. Compl. ¶¶ 5, 47, 83.

Levey avers that on February 20, 2002 she and her husband Dan Levey unknowingly signed papers for a mortgage loan from BNC Mortgage for $73,950 which they believed to be a debt-consolidation loan ("BNC Loan"). Compl. ¶¶ 9-10. At the closing, Levey paid a variety of fees including a "yield-spread premium" which she allegedly did not agree to. Compl. ¶¶ 12-16. Levey further states that BNC Mortgage "granted, bargained, sold, assigned, transferred or set over the Levey Mortgage to" CitiMortgage. Compl. ¶ 17.

CitiMortgage attaches various documents to its motion to dismiss which it maintains are properly before the court,

and which show that Levey and her husband entered into a separate and succeeding mortgage loan in January 2003 with First National Bank of Arizona ("First National Loan"). Mot. 2, Ex. B. CitiMortgage asserts that it is the assignee of the First National Loan, not the BNC Loan that is the focus of Levey's allegations. Mot. 3, Ex. C, D.

## II. ANALYSIS

Rule 12(b)(6) allows a defendant to seek dismissal of a complaint that fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). On a Rule 12(b)(6) motion the court must accept as true the allegations of the complaint and draw all reasonable inferences in favor of the plaintiff. *Pisciotta v. Old Nat'l Bancorp,* 499 F.3d 629, 633 (7th Cir.2007) (internal citation omitted). Legal conclusions, however, are not entitled to any assumption of truth. *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1940, 174 L.Ed.2d 868 (2009). To survive a Rule 12(b)(6) motion, "the complaint need only contain a 'short and plain statement' of the claim showing that the pleader is entitled to relief.' " *EEOC v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir.2007) (quoting Fed.R.Civ.P. 8(a)(2)). However, the allegations must provide the defendant with "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citing *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The plaintiff need not plead particularized facts, but the factual allegations in the complaint must be sufficient to "state a claim to relief that is plausible on its face[.]" *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1940 (citing *Twombly,* 550 U.S. at 556).

## A. FHA Claim (Count V)

**\*2** The FHA prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling or in provisions of services or facilities therewith, because of race, color, religion, sex, familial status or national origin." 42 U.S.C. § 3604(b). Respecting mortgage loans, the FHA regulations specifically forbid discrimination "against any person in making available loans or other financial assistance for a dwelling, or which is or is to be secured by a dwelling" based on the same criteria prohibited by statute. 24 C.F.R. § 100.120.

Hyles fails to allege any facts which might be construed to state a claim against CitiMortgage under the FHA. *See generally* Compl. All of Hyles's allegations of wrongdoing are directed at co-defendant Mark Diamond and various entities with whom he was associated, not against CitiMortgage. Indeed, Hyles avers in his complaint that CitiMortgage was *not present* at the closing of the Mortgage and does not allege that CitiMortgage had any involvement at all with setting the terms of the Mortgage originated by Delta. Compl. ¶ 46(a). CitiMortgage, moreover, is referred to throughout the complaint as an assignee of the Mortgage. *See* Compl. None of Hyles' allegations, then, are sufficient to state a claim that CitiMortgage has discriminated against Hyles in "making available loans or other financial assistance for a dwelling," because Hyles has not claimed that CitiMortgage ever made him a loan. 42 U.S.C. § 3604(b).

The same reasoning applies to the BNC Loan issued to Levey, who avers that CitiMortgage was not present at the origination of the BNC Loan and is referred to throughout the complaint as an assignee.[2] Compl. ¶ 45(a).

Hyles and Levey *have* alleged that CitiMortgage discriminated against them on the basis of race by "contracting or assuming a contract" for the Mortgage and the BNC Loan because the "contracted" mortgages contained "terms and conditions less favorable than mortgage loans" that CitiMortgage "contracted" from similarly-situated, non-minority borrowers. Compl. ¶ 75. While FHA regulations prohibit purchasers of loans from refusing "to purchase loans ... or ... impos [ing] different terms or conditions for such purchases" based on race or other impermissible criteria, Plaintiffs' allegations cannot be construed to make out such a claim because they have not pled any facts related to the sale or transfer of the loans from Delta or BNC to CitiMortgage. *See* 24 C.F.R. § 100.125. As a consequence, Hyles and Levey have also failed to allege that CitiMortgage imposed different terms or conditions on the "purchase" of the Mortgage or the BNC Loan based upon Plaintiffs' race or other forbidden criteria. Absent such allegations, Hyles and Levey have failed to state a claim under the FHA upon which relief can be granted. The court dismisses Count V of the Complaint.

## B. ECOA Claim (Count VI)

The ECOA makes it unlawful for any "creditor" to discriminate against "any applicant with respect to any credit transaction" on the basis of race and a number of

other prohibited grounds. The ECOA defines a "creditor" broadly to include an assignee who "participates in a credit decision, including setting the terms of the credit," but explicitly precludes assignee liability where an assignee did not participate in a credit decision and is being sued for acts "committed by another creditor." An assignee may be found liable for acts committed by another creditor, however, if it "knew or had reasonable notice of the act, policy, or practice that constituted the violation before becoming involved in the credit transaction." 12 C.F.R. § 202.2(*l*).

  **3** As discussed in Section A above, the Complaint plainly states that CitiMortgage was not present at the origination of the Mortgage or the BNC Loan and is being sued as an assignee. *See* Compl. ¶¶ 45, 46. Plaintiffs have additionally failed to allege any facts accusing CitiMortgage of any involvement whatsoever in the origination of the Mortgage or the BNC Loan. Plaintiffs' allegations are thus insufficient to establish that CitiMortgage was a creditor "who participate[d] in the credit decision" under ECOA regulations. *See* 12 C.F.R. § 202.2; *cf. Miller v. Countrywide Bank, N.A.,* 571 F.Supp.2d 251 (D.Mass.2008) (finding assignee a creditor under the ECOA regulations where it set policies affecting the terms of mortgage loans at their origination).

Absent allegations that CitiMortgage participated in setting the terms of the Mortgage or the BNC Loan, Plaintiffs must show that CitiMortgage "knew or had reasonable notice of the act, policy, or practice" committed by Mark Diamond or BNC that allegedly violated the ECOA. Nowhere in the complaint do Hyles or Levey allege that CitiMortgage "knew" of the ECOA violations allegedley committed by Mark Diamond or BNC when it purchased or was assigned either loan. Plaintiffs must therefore allege that CitiMortgage had reasonable notice of the "act, policy, or practice" underlying the origination of the Mortgage or the BNC Loan to state a claim under the ECOA.

In their response Plaintiffs appear to argue that allegations in the Complaint support two theories of reasonable notice to CitiMortgage of the wrongdoing that allegedly occurred at the origination of the Mortgage and the BNC Loan. First, Hyles contends that paragraph 36 of the Complaint (which cites to Compl., Ex. 14, "HUD-1 Settlement Statement") indicates that a "yield spread premium" was paid to Delta, and that paragraphs 34 and 35 of the Complaint state that Hyles did not receive the $23,208.29 payment indicated on the HUD-1 statement (Compl., Ex. 14). As a result, Hyles contends, the malfeasance at the closing of the Mortgage was "obvious on

the face of the loan documents." Resp. Br. 8. Yet even with this gloss, Hyles's statements cannot be construed to allege any facts consistent with CitiMortgage having reasonable notice of an ECOA violation occurring at the Mortgage closing. ECOA prohibits differential treatment by creditors *on the basis of race,* or membership in another protected class. Hyles has not alleged that any portion of the loan documents can be construed to have given reasonable notice to CitiMortgage that the Mortgage terms were determined by Diamond and Delta utilizing any of ECOA's forbidden discriminatory criteria.

Levey presents similar evidence in an effort to sustain a reasonable notice theory and her allegations are lacking for the same reasons Hyles' are. *See* HUD-1 Statement (Compl., Ex. 7). Hyles and Levey's first "reasonable notice" theory therefore fails.

Second, Hyles and Levey argue that paragraphs 74-87 of the Complaint (summarizing several general longitudinal studies and reports showing racial differentials in Chicago's rates of foreclosure, and the mortgage terms offered to its residents) are sufficient to state a claim against CitiMortgage under the ECOA. Resp. Br. 9. Plaintiffs' response brief does not cite a single case where general longitudinal studies support a finding of reasonable notice to an assignee creditor of an ECOA violation at origination, nor can this court locate one. *See id.* Moreover, even assuming *arguendo* that these studies were specific enough potentially to notify CitiMortgage of an ECOA violation regarding the Mortgage, Plaintiffs have not alleged that CitiMortgage knew or reasonably should have known of the studies or the facts underlying them. *Iqbal* teaches that a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1940. Here, where liability hinges on reasonable notice of a violation by another creditor, Plaintiffs do not allege any facts related to the manner in which these studies were to have come to the attention of CitiMortgage. Plaintiffs' response brief implies that the very existence of these studies, or the racial disparities that they allegedly reflect, should be enough to give CitiMortgage reasonable notice of the specific wrongdoing at the origination of the Mortgage or the BNC Loan. The court declines to credit these attenuated pleadings and finds that they insufficiently allege that CitiMortgage had reasonable notice of an ECOA violation related to the Mortgage or the BNC Loan.

**\*4** Finally, the allegations Plaintiffs make by citation to these studies cannot constitute reasonable notice because their findings are too general; none of the studies may be construed to have reasonably notified CitiMortgage of the type of wrongdoing alleged at the origination of the Mortgage or the BNC Loan.

The Complaint cites three separate studies: (1) the National Delinquency Survey of the Mortgage Brokers Association (showing that in 2002 the nine predominantly African-American neighborhoods in Chicago had a foreclosure rate of 41%, 35 times the national average for non-minority borrowers) (Compl.¶ 78); (2) a Woodstock Institute Study (stating that in predominately African-American Chicago neighborhoods 34.5% of the mortgages were subprime and likely to fail) (Compl.¶ 80); and (3) an article by the Chicago Reporter (finding that in 2006 African-American and Latino homeowners in the Chicago area received nearly 50% of "high-cost" loans) (Compl.¶ 81).

For ECOA liability to reach to an assignee, a plaintiff must allege reasonable notice of violative acts by "another creditor." None of these studies focus on any of the creditors-Mark Diamond, Delta Funding, BNC-who were involved in the origination of the Mortgage or the BNC Loan and so cannot be construed to have provided the kind of notice to CitiMortgage that ECOA demands in order to extend liability to an assignee. *Cf. Barber v. Fairbanks Capital Corp.,* 266 B.R. 309 (Bankr.E.D.Pa.2001) (refusing to extend assignee liability under ECOA where plaintiff did not allege assignee had knowledge or reasonable notice of ECOA misconduct at the mortgage origination).

Hyles and Levey have failed to state a claim under the ECOA; Count VI of the Complaint is dismissed.

### C. Illinois Common Law Unconscionability (Count I)
CitiMortgage argues that Hyles' common law unconscionability claim should be dismissed because Hyles has not alleged facts sufficient to establish that the Mortgage (1) was "so one-sided that only one under delusion would make [it] and only one unfair and dishonest would accept [it]," or (2) that "some impropriety during the formation of the contract ... deprived one party of meaningful choice." Mot. 4. The court disagrees and denies CitiMortgage's motion to dismiss Count I of the Complaint, finding that Hyles has pled facts sufficient to support a finding of unconscionability.

In Illinois, a finding that an agreement is unconscionable "may be based on either procedural or substantive unconscionability, or a combination of both." *Kinkel v. Cingular Wireless LLC,* 223 Ill.2d 1, 306 Ill.Dec. 157, 857 N.E.2d 250, 263 (Ill.2006). Substantive unconscionability "concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." *Kinkel,* 306 Ill.Dec. 157, 857 N.E.2d at 267. "Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice." *Id.*

A finding of procedural unconscionability requires a court to consider "the circumstances surrounding the transaction including the manner in which the contract was entered into, [and] whether each party had a reasonable opportunity to understand the terms of the contract." *Keefe v. Allied Home Mortg. Corp.,* No. 5-07-0463, 2009 WL 2027244 (Ill.App.Ct.2009) (citing *Frank's Maint. v. Eng'g, Inc.,* 86 Ill.App.3d 980, 42 Ill.Dec. 25, 408 N.E.2d 403, 409-10 (Ill.App.Ct.1980)). Moreover, a finding of unconscionability may turn on a showing of acts of bad faith "such as concealments, misrepresentations, [or] undue influence." *Taylor v. Bob O'Connor Ford, Inc.,* No. 97-C0720, 2000 WL 876920, at \*3 (N.D.Ill.2000); *see also Mitchem v. Am. Loan Co., Inc.,* No. 99-C1868, 2000 WL 290276 at \*4 (N.D.Ill.2000) (unconscionability doctrine is "closely allied ... to fraud and duress, [and] is designed to prevent overreaching at the contract-formation stage") (*citing Orig. Great Am. Choc. Chip Cookie v. River Valley,* 970 F.2d 273, 281 (7th Cir.1992)). Here, Hyles has alleged that he is illiterate, and so did not and could not read the documents that he signed, and, furthermore, that neither Diamond nor the agent for Delta explained the contents of any of the documents he signed at the closing of the Mortgage. Additionally, Hyles has attached evidence to the Complaint showing that at least one of the closing documents was missing required information. Compl. ¶¶ 4, 33, Ex. 13. And, finally, Hyles avers that he never received the $23,208.29 that the closing documents state that he was paid in cash at closing. All of these statements if true are sufficient to sustain a cause of action for unconscionability in Illinois because they allege concealments and misrepresentations and show that Hyles may not have had "a reasonable opportunity to understand the terms of the contract." *Keefe,* 2009 WL 2027244 at \*4.

**\*5** Because the court finds that Hyles has made allegations sufficient to show procedural unconscionability, and such a showing is sufficient to plead that a contract is

unconscionable in Illinois, the court declines to opine as to whether Hyles has adequately pled that the Mortgage was substantively unconscionable.

Levey's allegations of procedural unconscionability, however, are inadequate. Levey elliptically argues that her unconscionability claim is well pled because the Complaint states that she has difficulty reading documents because of her health issues and that her husband was very sick when he entered into the BNC Loan. Levey additionally alleges that she never "received the proceeds of the approximately $100,000 loan." Resp. Br. 10; Compl. ¶¶ 3, 19.

Levey cites no authority for the proposition that general averments of sickness or difficulty reading documents sufficiently state a claim that a contract was procedurally unconscionable. Moreover, Levey's allegation that she never received "approximately $100,000" from the proceeds of the BNC loan is flatly contradicted by the BNC Loan HUD1 Statement (which Levey has attached to the Complaint as Exhibit 7), which shows that Levey was to be paid only $54.85 of the nearly $74,000 loan issued by BNC; the majority of the proceeds were distributed to pay off Levey's previous mortgages. *See* Compl., Ex. 7, Lns. 104-05, 303. The closing document that Levey submitted with the Complaint, then, contradict her assertion of fraud. *See Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.,* 179 F.3d 523, 529 (7th Cir.1999) ("A plaintiff may plead [herself] out of court by attaching documents to the complaint that indicate ... she is not entitled to judgment."). The court, therefore, cannot construe her claim to allege the bad faith or fraud which would bear on an unconscionability analysis. *Cf. Mitchem v. Am. Loan Co., Inc.,* No. 99-1868, 2000 WL 290276 at *4 (unconscionability is closely related to fraud).

Count I of the Complaint is dismissed only as to Levey.

**D. ICFA Claim (Count II)**
To hold an assignee liable under the ICFA Plaintiffs must allege that CitiMortgage "actively and directly participated in the fraud" alleged in the Complaint. *Jackson v. South Holland Dodge, Inc.,* 312 Ill.App.3d 158, 244 Ill.Dec. 835, 726 N.E.2d 1146, 1155 (Ill.App.Ct.2000). Unambiguous Illinois precedent limits ICFA claims to "conduct that defrauds or deceives consumers or others" and "does not provide a cause of action against those *who knowingly receive benefits from the person committing the violation." Zekman v. Direct Am. Mktrs., Inc .,* 692 N.E.2d 853, 859 (Ill.1998) (emphasis added); *see also Costa v. Mauro Chevrolet, Inc.,*

390 F.Supp.2d 720, 735 (N.D.Ill.2005) (citing *Zeckman,* 692 N.E.2d); *Mfrs. & Traders Trust v. Hughes,* No. 99-C5849, 2003 WL 21780956, at *2 (N.D.Ill.2003).

Hyles and Levey have averred that CitiMortgage was not present at the closing of the Mortgage or the BNC Loan and have alleged no facts which may be construed to allege that CitiMortgage was involved in the alleged fraud at the origination of either contract. Compl. ¶¶ 45(a), 46(a). Consequently, Plaintiffs have not pled that CitiMortgage "actively and directly" participated in the alleged fraud and Count II of the Complaint is therefore dismissed. *Jackson,* 244 Ill.Dec. 835, 726 N.E.2d at 1155.

**E. Inducement to Breach Fiduciary Duty (Count III and IV)**
 *6 Hyles and Levey maintain that CitiMortgage is liable for inducing their respective mortgage brokers to breach their fiduciary duty to Hyles and Levey. An assignee may be liable for inducement of the breach of another's fiduciary duty only if a plaintiff demonstrates that the defendant (1) colluded with a fiduciary in committing a breach; (2) knowingly participated in or induced the breach of duty; and (3) knowingly accepted the benefits of the breach. *See Regnery v. Meyers,* 287 Ill.App.3d 354, 223 Ill.Dec. 130, 679 N.E.2d 74, 80 (Ill.App.Ct.1997). Hyles and Levey have not alleged facts sufficient to meet any of these legal standards.

With respect to the first two requirements, Plaintiffs' pleadings are insufficient for the same reasons their ICFA claims were inadequate: they have (1) averred that CitiMortgage was not present at the origination of the Mortgage or the BNC Loan and (2) failed to allege that CitiMortgage colluded with Diamond, Delta or BNC, or otherwise participated in the alleged breach. Compl. ¶¶ 45(a), 46(a).

As for the third requirement (that CitiMortgage knowingly accepted the benefits of the breach), Hyles contends that wrongdoing was obvious from the face of the loan documents because "$11,458.00 was paid to Delta Funding for a 'Loan Discount'" (Compl., Ex. 14, ln.802) and "$1,010.00 was paid to OSI Financial for [the] 'Mortgage Broker Fee.' " Resp. Br. 8. The Complaint alleges that these payments represent an "excessive" "yield-spread" premium because "Mark Diamond did not perform" his fiduciary duty, and because Hyles never received the $23,208.29 in cash reflected in the closing documents. Compl. ¶¶ 34, 35.

None of these claims sufficiently allege that CitiMortgage knew of the breach of fiduciary duty because (1) the payments to Diamond and Delta listed on the face of the loan document are not illegal, and so cannot be found to have apprised CitiMortgage of wrongdoing and (2) CitiMortgage would be unable to deduce from the face of the loan documents-which list a cash payment to Hyles-that Hyles never received the payment. *See* Real Estate Settlement Procedures Act Statement of Policy 2001-1 [hereinafter RESPA Stmt. of Policy] (yield-spread premium payment is not "per se legal or illegal").

For her part, Levey alleges that she paid an assortment of fees amounting to approximately $2500 (including a $369.75 "yield spread premium") and that she never received the "proceeds of the approximately $100,000 loan." Compl. ¶¶ 12-14, 19. As discussed in Section C above, the HUD-1 statement explains how the "$100,000" was dispersed by showing that Levey was only to be paid $54.85 of the nearly $74,000 loan issued by BNC, with the majority of the proceeds distributed to pay off the Levey's previous mortgages. *See* Compl., Ex. 7, Ln. 104-05, 303. And, in any case, CitiMortgage could not be expected to know from the face of the loan documents that listed payments were not in fact made. As for the fees Levey paid at closing, they are not illegal and not alleged to be illegal, and so cannot be found to have apprised CitiMortgage of the wrongdoing Levey alleges occurred at the BNC Loan origination. *See* RESPA Stmt. of Policy (yield-spread premium payment is not "per se legal or illegal").

**\*7** Counts III and IV are dismissed.

### III. CONCLUSION

CitiMortgage's Motion to Dismiss is granted in part and denied in part; Counts I-III and V-VI of the Fourth Amended Complaint are dismissed as to Plaintiff Dorothy Levey and Counts II and IV-VI are dismissed as to Moses Hyles. Count one of the Complaint remains against CitiMortgage, but only as to Moses Hyles.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 2475222

Footnotes

1    CitiMortgage has filed two separate motions to dismiss, one for each Plaintiff. For the convenience of the court, however, this memorandum and order rules on CitiMortgage's motions jointly. *See* Doc. Nos. 63, 66.

2    In an effort to establish that it is not the assignee of the BNC Loan at issue here, CitiMortgage presented a variety of documents to the court with its motion to dismiss, including the mortgage agreement and HUD-1 settlement statement for a loan between Levey and First National Bank of Arizona (which noted a payoff to Countrywide Home Loans in an amount nearly equivalent to the amount of the BNC Loan). Though this evidence was suggestive, it was not sufficiently clear evidence of the falsity of Levey's claims to overcome the presumption on a motion to dismiss that all facts in the Complaint are true. CitiMortgage's evidence is specifically lacking because CitiMortgage failed to provide the court with a copy of the documents which assigned the First National Loan to CitiMortgage. Without a copy of that agreement (and given that the First National Loan shows a payoff to Countrywide Home Loans-not BNC), CitiMortgage is asking the court to rely on the word of its attorneys for the proposition that it is the assignee of the First National Loan. At this stage in particular, such reliance is inappropriate. Accordingly, the court will treat CitiMortgage as if it were the assignee of the BNC loan for purposes of this motion to dismiss.

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4097221
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Dale MECHERLE, Plaintiff,

v.

TRUGREEN, INC., A Delaware Corporation,
Trugreen Companies, LLC, A Delaware
Corporation, and Servicemaster Company,
Delaware Corporation, Defendants.

No. 12 C 1617.  |  Sept. 14, 2012.

**Attorneys and Law Firms**

Arthur R. Ehrlich, Jonathan C. Goldman, Goldman & Ehrlich,
Chicago, IL, for Plaintiff.

Jennifer L. Schilling, Brandon Robert Mita, Littler
Mendelson, P.C., Chicago, IL, for Defendants.

### MEMORANDUM OPINION & ORDER

JOAN B. GOTTSCHALL, District Judge.

**\*1** Plaintiff Dale Mecherle sued Defendants Trugreen, Inc.,
Trugreen Companies, LLC, and The Servicemaster Company
(collectively "Defendants") for violations of the Americans
with Disabilities Act (the "ADA"), 42 U.S.C. § 12117,
and for retaliatory discharge under Illinois law, based on
Defendants' alleged failure to accommodate his disability
and termination of his employment. Now before the court
is Defendants' Motion to Compel Arbitration pursuant to
the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, and
Federal Rule of Civil Procedure 12(b)(6). Defendants argue
that Mecherle is a party to a dispute resolution program that
requires him to arbitrate his claims. The court agrees and
grants Defendants' Motion to Compel Arbitration.

### I. BACKGROUND

**A. Mecherle's Allegations**
Mecherle was employed by TruGreen Limited Partnership
("TruGreen"), a subsidiary of The ServiceMaster Company
("ServiceMaster"), beginning in approximately 1989.

According to the Complaint, Mecherle began working as a
service manager for Defendants in approximately 2005. In
2007 and 2010, as a result of work related injuries, Mecherle
had surgery on his shoulders. This limited his ability to
lift, perform manual tasks, push and pull, and do repetitive
overhead work. According to Mecherle, however, he was able
to perform the essential functions of his job.

Prior to 2010, Mecherle was allowed to continue to work
despite his limitations. Mecherle alleges that, after a medical
leave in June 2010, he was released by his physician to
perform his managerial duties, but Defendants refused to
allow him to return to work. In January 2011, after Mecherle's
second shoulder surgery, Defendants again refused to allow
him to return to work or to consider any accommodations for
him.

In or about February 2011, Defendants told Mecherle that
his service manager position had been filled and that there
were no open manager positions, but that he could apply for
a position if one became available in the future. Mecherle
alleges that he subsequently applied for open manager
positions, but Defendants told him there were no open
positions—despite posted vacancies—or told him that he
could not perform the jobs for which he applied. Defendants
formally terminated Mecherle's employment on March 5,
2012. Mecherle alleges that Defendants accommodated other
managers who had physical and weight-lifting restrictions
similar to or more restrictive than Mecherle's, and that
Defendants' refusal to accommodate him violated the ADA.
Mecherle further alleges that Defendants terminated him, in
violation of Illinois common law, in retaliation for incurring a
work-related injury and for filing a claim under the Worker's
Compensation Act for his work-related injury.

**B. The "We Listen" Program**
Defendants argue that, effective January 1, 2009,
ServiceMaster implemented an alternative dispute resolution
program known as "We Listen" to be utilized by its
subsidiaries, including Mecherle's employer, TruGreen.
Under the program, employees agreed as a term and condition
of their employment to use the program to address any
employment-related complaints, including discrimination on
the basis of disability, retaliation, and wrongful discharge.
The program entails an internal dispute resolution procedure,
followed, if necessary, by arbitration.

**\*2** Defendants contend that Mecherle was made aware of
the "We Listen" program and voluntarily agreed to submit

Case: 1:15-cv-05601 Document #: 10-2 Filed: 10/15/15 Page 14 of 25 PageID #:97

Exhibit 2

his employment-related disputes to arbitration. Defendants submit as evidence of the fact that Mecherle was on notice of the program the declaration of Roy Cohen, ServiceMaster's Vice President of Human Resources. Cohen states that Mecherle was given access to and a copy of the "We Listen" program on or about December 15, 2008. (Defs.' Mem. in Supp. of Mot. to Compel Ex. 1 (Cohen Decl.) ¶ 10, ECF No. 15; Ex. 1–B ("We Listen" Program).) The packet of "We Listen" materials dated December 15, 2008, submitted as an exhibit to Cohen's declaration, states that the plan covers all "associates" employed by ServiceMaster. ("We Listen" Program 7.) It further states that employees "are automatically required to use th[e] program if after January 1, 2009," they continue their employment with ServiceMaster. (*Id.*) A section of the packet entitled "Questions and Answers" states:

> After January 1, 2009, all ServiceMaster associates ... in the United States are required to use the *We Listen* program: administrative support staff, professionals, technicians, laborers, sales associates, managers and senior executives. In addition, all ServiceMaster associates who leave ServiceMaster employment after January 1, 2009, are required to use *We Listen* to resolve ServiceMaster employment-related issues.

(*Id.* at 13.) According to Defendants, on October 27, 2009, Mecherle completed an online training course on the "We Listen" program, as evidenced by a copy of his training log, which indicates that the "We Listen" training module was accessed and completed on that date. (*Id.* at ¶ 11; Ex. 1–D (Training Log).)

Defendants further claim that in 2010, Mecherle received a copy of the TruGreen Associate Handbook, dated January 1, 2010, which referenced the "We Listen" program and informed employees that the complete program was available for online review. (Defs.' Mem. in Supp. of Mot. to Compel Ex. 1–E (Handbook).) On February 22, 2010, Mecherle electronically signed and acknowledged receiving the Handbook. By clicking a box, Mecherle indicated that he "agree[d] with the conditions specified" in the Handbook, including the requirement that he utilize the "We Listen" program "to resolve any and all work-related disputes/ concerns and to arbitrate such disputes if they are not

resolved." (Defs.' Mem. in Supp. of Mot. to Compel Ex. 1–F (Handbook Acknowledgement Form).) A revised version of the "We Listen" program was mailed to Mecherle's home on December 14, 2011. (Cohen Decl. ¶ 14; Defs.' Mem. in Supp. of Mot. to Compel Ex. 1–C (2012 Revision).)

In response, Mecherle states in an affidavit that in or about October 2009, he "was told that as a manager," he was to undergo online training on the "We Listen" program, but that "[t]o the best of [his] memory, [he] did not receive any information at that time about having to resolve any complaints ... through any arbitration process." (Pl.'s Resp. to Defs.' Mot. to Compel Ex. 1 (Mecherle Aff.) ¶ 2, ECF No. 18–1.) He further states that he "was not told in either 2010 or 2011 that [he] would have to file an arbitration complaint in order to be able to return to work." (*Id.* at ¶ 6.)

## II. LEGAL STANDARD

**\*3** Under the Federal Arbitration Act ("FAA"), "private agreements to arbitrate are enforced according to their terms," *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 53–54, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), and an arbitration clause in "a contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Federal courts apply state contract law to determine whether an arbitration agreement is valid, enforceable, and applicable to a dispute. *Faulkenberg v. CB Tax Franchise Sys., LP,* 637 F.3d 801, 809 (7th Cir.2011); *Gore v. Alltel Commc'ns, LLC,* 666 F.3d 1027, 1032 (7th Cir.2012). Arbitration agreements are treated like other contracts under Illinois law, meaning there must be an "offer, acceptance and consideration." *Vassilkovska v. Woodfield Nissan, Inc.,* 358 Ill.App.3d 20, 294 Ill.Dec. 207, 830 N.E.2d 619, 623–24 (Ill.2005).

The FAA does not specify the evidentiary standard a party seeking to avoid compelled arbitration must meet. But courts have analogized the standard to that required of a party opposing summary judgment under Federal Rule of Civil Procedure 56(e). The party opposing arbitration bears the burden of establishing why the arbitration provision should not be enforced, *Green Tree Fin. Corp. Ala. v. Randolph,* 531 U.S. 79, 91–92, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), and "must identify a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract." *Tinder v. Pinkerton Sec.,* 305 F.3d 728, 735

(7th Cir.2002). As with a motion for summary judgment, the court accepts "the evidence of the non-movant" and draws "all justifiable inferences ... in his favor." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## III. ANALYSIS

Mecherle does not argue that arbitration agreements such as the "We Listen" program are unenforceable, or that his claims of discrimination and retaliation are not covered by the program, but rather that the program does not apply to him because he did not have notice of it or agree to be bound by it. Alternatively, he argues that the arbitration agreement is not an enforceable contract under Illinois law because no consideration was provided in exchange for his agreement to submit claims to arbitration.

### A. Notice of the Agreement

Mecherle first argues that he was not bound by and did not agree to the arbitration agreement set out in the "We Listen" program. He claims that Defendants have not produced evidence that he had access to any materials about the "We Listen" program in 2008. He further claims that the training that he was provided regarding the program in October 2009 "only related to his role as a manager and how, as a manager, he was to 'listen' to complaints from associates;" it did not inform him that he was himself bound by an arbitration provision. Finally, Mecherle argues that the program in effect beginning in 2008 applied only to "associates," not to managers like himself. (Pl.'s Resp. to Mot. to Compel 2, ECF No. 18.)

 **\*4** Mecherle has failed to "identify a triable issue of fact concerning" whether he had notice of the "We Listen" program in 2008 or 2009. *See Tinder,* 305 F.3d at 735. Defendants have offered evidence, in the form of Cohen's declaration and its supporting exhibits, that Mecherle was provided with a packet of information about the "We Listen" program on or about December 15, 2008. Mecherle has not presented evidence, by affidavit or otherwise, that suggests that he did not receive materials about the program. His affidavit does not mention the December 15, 2008, information packet at all. Rather, he argues that Cohen's affidavit is insufficient evidence to establish that Mecherle had access to the packet, because Cohen's employment at Service Master did not begin until January 2009. The

court, however, finds the affidavit sufficient to establish that program materials were provided to ServiceMaster employees. As Vice–President of Human Resources, Cohen was in a position to confirm that the materials had been provided by his department to employees shortly before his tenure with ServiceMaster began.

Furthermore, although Mecherle claims that "[t]o the best of [his] memory, [he] did not receive any information at that time about having to resolve any complaints ... through any arbitration process" (Mecherle Aff. ¶ 2.), the evidence clearly shows that Mecherle did have access to this information. Mecherle concedes that he was required to undergo training on the program in 2009, and Defendants produced evidence that he completed the "We Listen" training module on October 27, 2009. In *Tinder,* the Seventh Circuit held that a plaintiff's affidavit stating that she did "not remember receiving or seeing [a] brochure" about an arbitration program was insufficient to raise a genuine issue of fact when the defendants presented evidence that the brochure was included with her paycheck. 305 F.3d at 735–36. Similarly, here Mecherle's affidavit claiming lack of knowledge of the program is insufficient to create a dispute as to whether he had access to the program materials in 2008 and 2009, when Defendants' evidence shows that he did have access to the information packet and the online training program.

As to Mecherle's argument that the program did not cover managers, the court finds that Defendants have produced undisputed evidence that the definition of a ServiceMaster "associate" encompassed "managers." This was clearly explained in the information packet provided to employees on December 15, 2008. Mecherle may be bound by an arbitration agreement regardless of whether he actually read the materials with which he was provided, including the "Questions and Answers" section, which explained that, as a service manager, he was considered a ServiceMaster "associate" for purposes of the "We Listen" program. *See, e.g .,* *Paper Express, Ltd. v. Pfankuch Maschinen GmbH* 972 F.2d 753, 757 (7th Cir.1992) ("[A] party who agrees to terms ... without understanding or investigating those terms does so at his own peril."); *see also Hill v. Gateway 2000, Inc.,* 105 F.3d 1147, 1148 (7th Cir.1997) ("A contract need not be read to be effective; people who accept the risk that the unread terms may in retrospect prove unwelcome."). In summary, the court concludes that Mecherle had notice of the arbitration program, and that as a manager, he was covered by it.

## B. Consideration

**\*5** Mecherle argues, in the alternative, that the arbitration agreement was invalid because it was not supported by consideration, as required by Illinois contract law. Under Illinois law, continued employment after notice of an arbitration program constitutes acceptance and consideration. *See, e.g., Melena v. Anheuser–Busch, Inc.,* 219 Ill.2d 135, 301 Ill.Dec. 440, 847 N.E.2d 99, 109 (Ill.2006). Mecherle claims, however, that he worked for TruGreen for only a few months after receiving notice of the "We Listen" program. Mecherle was on medical leave as of April 2010, and he was not allowed to return to work after he was released by his physician to perform his managerial duties.

The court disagrees that Mecherle's continued employment by TruGreen is inadequate consideration. Mecherle was on notice of the "We Listen" program as early as December 15, 2008, when he received materials about the program (and certainly as of October 27, 2009, when the evidence shows that he completed a training program about the program). Thus, even if his employment had ended in April 2010, he was employed for at least fifteen months after receiving notice of the program. But Mecherle's employment was not officially terminated until March 5, 2012, over three years after he received notice of the program. Defendants have

presented evidence that he continued to receive benefits from TruGreen, in the form of dental and disability coverage and basic life insurance, until that date. (*See* Defs.' Reply in Supp. of Mot. to Compel Attach. 2 (Curt Decl.), ECF No. 20.) Mecherle's continued employment and his receipt of these benefits constituted consideration for his agreement to be bound by the arbitration program. He has therefore failed to raise a disputed question of fact as to whether the arbitration agreement is unenforceable for lack of consideration.

## IV. CONCLUSION

As a valid arbitration agreement covered the dispute in question in this case, the court grants Defendants' Motion to Compel Arbitration. Section 3 of the FAA directs courts to stay proceedings that have been referred to arbitration until arbitration has been completed. 9 U.S.C. § 3; *see also Cont'l Cas. Co. v. Am. Nat'l Ins. Co.,* 417 F.3d 727, 732 (7th Cir.2005). The case is therefore stayed pending arbitration.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 4097221

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1118942
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Alisha MONTGOMERY, et al., Plaintiffs,
v.
CORINTHIAN COLLEGES, INC. and
Corinthian Schools, Inc., d/b/a Everest
College and Olympia College, Defendants.

No. 11 C 365. | March 25, 2011.

**Attorneys and Law Firms**

Kathleen Currie Chavez, Chavez Law Firm P.C., Matthew J.
Herman, Michael D. Wong, Robert M. Foote, Foote, Meyers,
Mielke & Flowers, LLC, Peter Lawrence Currie, The Law
Firm of Peter L. Currie, P.C., St. Charles, IL, for Plaintiffs.

Anneliese Wermuth, Jason E. Barsanti, Meckler Bulger
Tilson Marick & Pearson LLP, Chicago, IL, Peter W. Homer,
Homerbonner, Miami, FL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

HARRY D. LEINENWEBER, District Judge.

**\*1** Before the Court is Defendants' Motion to Compel
Individual Arbitration and Stay the Proceedings. For the
reasons contained herein, the Motion is granted.

## I. BACKGROUND

The thirty-three named Plaintiffs are current or former
students in the "Medical Assisting" program at the
Merrionette Park campus of Everest College. The school
is owned and operated by Defendants Corinthian Colleges,
Inc. and Corinthian Schools, Inc. (hereinafter, "Corinthian").
Plaintiffs brought the instant putative class action lawsuit
accusing Corinthian of a deceptive marketing scheme that
they claim has deceived thousands of students into pursuing
an education that has little value. Plaintiffs claim that
Corinthian deceived them about the program's accreditations,
cost, and job placement rates. They allege, *inter alia,* that
Defendants charged them in excess of the contracted amount

for tuition, falsified financial aid applications, and failed to
offer certain courses listed in the curriculum and placed on
their transcripts. Plaintiffs seek relief for breach of contract,
violation of the Illinois Consumer Fraud and Deceptive
Business Practices Act ("Consumer Fraud Act"), 815 ILCS
505/1, and unjust enrichment.

Defendants seek to compel individual arbitration of
these claims based on agreements to arbitrate signed by
the Plaintiffs. Twenty-eight Plaintiffs signed a six-page
Enrollment Agreement and a five-page document titled
"Enrollment Agreement Addendum and Disclosures." Each
of the twenty-eight Plaintiffs initialed each paragraph of
the addendum, which covered topics including placement,
salaries, and financial aid. The addendum begins with this
disclaimer:

> **Please take your time while you read the following
> information regarding your education program. Please
> ask us as many questions as you like. Do not sign until
> you fully understand and agree with each paragraph.
> Put your initials at the end of each paragraph indicating
> your understanding of, and agreement with, each item.
> When you have finished reading the entire form, please
> sign your name in the space provided.**

The arbitration provision appears on the last page of the
addendum and provides, in relevant part:

**AGREEMENT TO BINDING ARBITRATION AND
WAIVER OF JURY TRIAL.**

I agree that any dispute arising from my enrollment, no
matter how described, pleaded, or styled, shall be resolved
by binding arbitration under the Federal Arbitration Act
conducted by the American Arbitration Association under
its Consumer Rules.

**Terms of Arbitration.**

1. Both I and the School irrevocably agree that any dispute
between us shall be submitted to arbitration.

2. Neither I nor the School shall file or maintain any lawsuit
in any court against the other, and agree that any suit
filed in violation of this Agreement shall be dismissed by
the court in favor of an arbitration conducted pursuant to
this Agreement. Both I and the school agree that filing
a court action will cause damage to the other party.
We agree that an appropriate measure of this damage
includes the costs and attorney's fees actually incurred in

Case: 1:15-cv-05601 Document #: 10-2 Filed: 10/15/15 Page 18 of 25 PageID #:101
Montgomery v. Cornmtah Colleges, Inc., Not Reported in F.Supp.2d (2014)
Exhibit 2

compelling arbitration. Such damages shall be paid by the party who has filed an action in court within 30 days of the court's order compelling arbitration.

**\*2**  3. The costs of the arbitration filing fee, arbitrator's compensation and facilities fees shall be paid by the School, to the extent that the fees are greater that the applicable Court filing fee. The School shall not be solely responsible for arbitration costs beyond those for an individual student's claim.

4. I agree not to combine or consolidate any Claims with those of other students, such as in a class or mass action. *I may opt out of this no-consolidation provision by delivering a written statement to that effect received by the School within 30 days of my first execution of an Enrollment Agreement with the School.* (Emphasis in the original).

5. Any remedy available from a court under the law shall be available in the arbitration.

6. Nothing in this Agreement prohibits me from filing a complaint with the state regulatory agency.

**Procedure for Filing an Arbitration.**

1. I am strongly encouraged, but not required, to utilize the Grievance Procedure described in the Catalog, prior to filing an Arbitration.

2. If I desire to file an Arbitration, I should first contact the School's President, who will provide me with a copy of the AAA Consumer Rules. If I desire to file an Arbitration, I should then contact the AAA which will provide the appropriate forms and detailed instructions. I should bring this document to AAA.

3. I may, but need not be, represented by an attorney in the arbitration.

**Acknowledgment of Waiver of Jury Trial and Availability of AAA Rules.**

By my signature, I acknowledge that I understand that both I and the School are irrevocably waiving rights to trial by jury, and are selecting instead to submit any and all claims to the decision of an arbitrator instead of a court. I understand that the award of the arbitrator will be binding and not merely advisory.

The twenty-eight Plaintiffs who executed this version of the Arbitration Agreement initialed every paragraph of these disclosures. Eight Plaintiffs, including three who signed the above Agreement, signed a second version of the Arbitration Agreement. In that version, the acknowledgment of waiver of trial by jury appeared in the body of the five-page enrollment agreement, directly above Plaintiffs' signatures. The agreement to arbitrate is similar to the one described above, but this version did not include a class-action waiver.

## II. *ANALYSIS*

Defendants' Motion to Compel Arbitration is brought pursuant to FED. R. CIV. P. 12(b)(1) because it contends that the court lacks subject-matter jurisdiction due to the arbitration agreement. *Lamb v. Gen. Elec. Consumer & Indus.,* 6 CV 216, 2006 WL 2228962, at \*1 (N.D.Ind. Aug.3, 2006). On a Rule 12(b)(1) motion, the Court may consider matters beyond the allegations in the complaint. *Falbe v. Dell, Inc.,* 4 C 1425, 2004 WL 1588243, at \*1 n. 1 (N.D.Ill. July 14, 2004).

The Federal Arbitration Act ("FAA") governs the validity of agreements to arbitrate. *Jain v. de Mere,* 51 F.3d 686, 688 (7th Cir.1995). Under the FAA, "a written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*" 9 U.S.C. § 2. (emphasis added). As such, arbitration provisions may be invali by general contract defenses like unconscionability. *Rent–A–Center, West, Inc. v. Jackson,* ––– U.S. ––––, ––––, 130 S.Ct. 2772, 2776, 177 L.Ed.2d 403 (2010). The court applies state law to determine the validity of an arbitration provision, but must keep in mind the federal policy favoring arbitrability of disputes. *Cont'l Cas. Co. v. Am. Nat. Ins. Co.,* 417 F.3d 727, 730–31 (7th Cir.2005). The party opposing arbitration bears the burden of showing why a particular provision should not be enforced. *O'Quinn v. Comcast Corp.,* 10 C 2491, 2010 WL 4932665, at \*2–3 (N.D.Ill. Nov.29, 2010) (citing *Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 91–92, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000)).

**\*3**  Here, Plaintiffs contend the Arbitration Agreements should be invalidated because they are unconscionable under Illinois law. Although Plaintiffs argue the agreements as a whole are unconscionable, they center their argument on

the validity of the class-action waiver provision. As noted above, five of the named Plaintiffs signed only a version of the Agreement that did not contain a class-action waiver. However, Plaintiffs argue those agreements are likewise unconscionable because those Plaintiffs are similarly denied the ability to proceed on a class basis. *See Stolt–Nielsen S.A. v. Animal Feeds Int'l Corp.,* —— U.S. ——, ——, 130 S.Ct. 1758, 1775, 176 L.Ed.2d 605 (2010) (holding that a party may not be compelled to submit to class arbitration unless the parties actually agreed to such arbitration).

Under Illinois law, which both sides agree applies here, "a finding of unconscionability may be based on either procedural or substantive unconscionability, or a combination of both." *Kinkel v. Cingular Wireless, LLC,* 223 Ill.2d 1, 306 Ill.Dec. 157, 857 N.E.2d 250, 263 (Ill.2006). Courts determine whether class-action waivers are unconscionable on a case-by-case basis. *Id.* at 278.

Here, Plaintiffs argue that the Arbitration Agreement, and the class-action waiver provision within it, is both procedurally and substantively unconscionable, so the Court will address both arguments.

### A. Procedural Unconscionability

Procedural unconscionability arises when a contract term is difficult to find, read, or comprehend. *Kinkel,* 306 Ill.Dec. 157, 857 N.E.2d at 264. The analysis also takes into account the disparity in bargaining power between the parties. *Id.* The Illinois Supreme Court has said that procedural unconscionability boils down to "impropriety during the process of forming the contract depriving a party of a meaningful choice." *Id.* (quoting *Frank's Maint. & Eng'g, Inc. v. C.A. Roberts Co.,* 86 Ill.App.3d 980, 42 Ill.Dec. 25, 408 N.E.2d 403, 410 (Ill.App.Ct.1980)). Illinois courts consider: (1) the manner in which the contract was formed; (2) whether each party had a reasonable chance to understand the contract; (3) whether key terms were "hidden in a maze of fine print." *Frank's Maint. & Eng'g,* 42 Ill.Dec. 25, 408 N.E.2d at 410.

Plaintiffs contend the agreement is procedurally unconscionable because it is an adhesion contract due to the disparity in bargaining power between the parties and because the agreement was presented on a "take it or leave it" basis. *Williams v. Ill. State Scholarship Comm'n,* 139 Ill.2d 24, 150 Ill.Dec. 578, 563 N.E.2d 465, 487 (Ill.1990). Additionally, Plaintiffs note that the enrollment agreement and addendum

total eleven pages, and that the five-page addendum itself has thirty different provisions, including those related to arbitration. The majority of the Plaintiffs had at most a high-school education, so "to suggest they completely read the ... document with all its legalese ... and knew and understood the significance of a class action ban in an arbitration provision is suspect to say the least," Plaintiffs argue.

**\*4** Defendants respond that Plaintiffs (at least those who signed the agreement with a class-action waiver) initialed every paragraph of the arbitration agreement and signed at the bottom of the page. They contend that the agreements were written in plain language and argue that any procedural unconscionability was negated by the provision giving students thirty (30) days to opt out of the class-action waiver.

Plaintiffs' argument that they lacked bargaining power in comparison with Defendants holds some weight. Defendants own and operate a large for-profit educational enterprise, which according to the Complaint earned more than $1.7 billion in revenue through the third quarter of 2010. But the Court notes that form contracts like the ones at issue here "are a fact of modern life" even if the average consumer does not completely understand them. *Kinkel,* 306 Ill.Dec. 157, 857 N.E.2d at 266. Further, the arbitration provisions are neither difficult to read nor hidden in either version of the agreement. The headings of various provisions are in boldface and font is of a normal size. Nor were the Enrollment Agreement and Addendums signed by the majority of the Plaintiffs unreasonably long at eleven pages. The same is true of the Agreement signed by eight of the Plaintiffs, which totals five pages, two of which contain the Arbitration Agreement. *See Brown v. Luxottica Retail N. Am. Inc.,* 09 C 7816, 2010 WL 3893820, at *1–3 (N.D.Ill. Sept.29, 2010) (finding a dispute resolution agreement in the middle of a 51–page employee handbook was neither hidden nor buried). Defendants' employees had no obligation to explain the arbitration provisions to Plaintiffs, and even if Plaintiffs did not read the provisions, they still can be bound by them. *Hill v. Gateway 2000, Inc.,* 105 F.3d 1147, 1148 (7th Cir.1997).

Plaintiffs additionally allege that one of them questioned a provision in the Addendum advising that the school does not guarantee employment, but was told by a recruiter that the provision was a formality and she was guaranteed a job. Pls.'s Comp. § 69. Accepting this allegation as true, it injects some degree of procedural unconscionability into the case. Misleading one of the parties about the significance of a contract term certainly amounts to impropriety in the

negotiation of the contract. *See Kinkel,* 306 Ill.Dec. 157, 857 N.E.2d at 264 (noting that the procedural unconscionability analysis encompasses conduct during the negotiations).

But Plaintiffs do not allege they were misled about the arbitration provisions or the class-action waiver, and the Court agrees with Defendants that the opt-out provision here is significant to determining the existence of both procedural and substantive unconscionability. Any of the twenty-eight Plaintiffs who signed the more common version of the Arbitration Agreement could have opted out of the class-action waiver within thirty (30) days of the execution of the Enrollment Agreement with no effect on their enrollment. None did so. This undermines their argument that this was an adhesion agreement in which they were forced to accept Defendants' terms. *See O'Quinn,* 2010 WL 4932665, at *5 (holding that opt-out provision in arbitration agreement "weighs heavily against a finding of procedural unconscionability"); *Pivoris v. TCF Fin. Corp.,* 07 C 2673, 2007 WL 4355040, at *4, 6 (N.D.Ill.Dec.7, 2007) (finding fact that plaintiff could have opted out of arbitration with no consequences weighed against finding either procedural or substantive unconscionability).

 **5** Based on its review of the agreements and the negotiations between the parties, the Court does not find such a degree of procedural unconscionability as to render the class-action waiver or the arbitration agreements themselves invalid. *See Kinkel,* 306 Ill.Dec. 157, 857 N.E.2d at 266 (finding that some degree of procedural unconscionability was not enough to invalidate class-action waiver).

### B. Substantive Unconscionability

While procedural unconscionability concerns the negotiation and placement of a contract term, substantive unconscionability looks to the fairness of the term itself. *Maxwell v. Fid. Fin. Servs., Inc. .,* 184 Ariz. 82, 907 P.2d 51, 58 (Ariz.1995). Contract terms are substantively unconscionable when they are: (1) so one-sided as to be oppressive; (2) imbalanced in the rights and obligations they impose; and (3) when there is a significant cost-price disparity, which involves a comparison of the cost of bringing an arbitration proceeding versus the damages the plaintiff can expect to receive. *Kinkel,* 306 Ill.Dec. 157, 857 N.E.2d at 267 (citing *Maxwell,* 907 P.2d at 58)). Under Illinois law, a class-action waiver will not be held substantively unconscionable if the plaintiff "had a meaningful opportunity to reject the

contract term or if the agreement containing the waiver is not burdened by other features limiting the ability of the plaintiff to obtain a remedy for the particular claim asserted in a cost-effective manner." *Kinkel,* 306 Ill.Dec. 157, 857 N.E.2d at 274. Here, as discussed above, those Plaintiffs who signed the version of the agreement with a class-action waiver had the opportunity to reject that term. The question then becomes whether the agreement allows the Plaintiffs to obtain a remedy for their claims in a cost-effective manner. The relevant inquiry is whether it is so expensive to vindicate a claim that the only reasonable way to obtain relief is to proceed on a class-action basis. *Kinkel,* 306 Ill.Dec. 157, 857 N.E.2d at 275; *see Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir.2004) (reasoning that "The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.").

Plaintiffs argue this is a case where the only reasonable way for them to obtain relief is through a class action. The amount in dispute is the tuition paid by each Plaintiff, or about $13,227.00. Plaintiffs argue this amount is insufficient for them to secure counsel, even though they also seek to recover attorneys' fees, costs, and punitive damages under the Consumer Fraud Act. They contend that when a defendant engages in "a scheme to deliberately cheat large numbers of customers out of individually small sums of money," an agreement to arbitrate is substantively unconscionable. *Kinkel,* 306 Ill.Dec. 157, 857 N.E.2d at 271–72 (quoting *Discover Bank v.Super. Ct. of L.A.,* 36 Cal.4th 148, 30 Cal.Rptr.3d 76, 113 P.3d 1100, 1110 (Cal.2005)). Defendants, however, point out that at least one of the Plaintiffs is seeking to recover more than $27,000.00. Defendants contend that even at about $13,000.00 each, the amount of damages sought by Plaintiffs is far greater than the amount at stake in cases in which courts have found it would be cost-prohibitive to force plaintiffs to pursue their claims individually. The Court agrees.

 **6** Plaintiffs cite several cases from other states or circuits, including *Laster v. AT & T Mobility LLC,* 584 F.3d 849, 855 (9th Cir.2009), *cert. granted,* ––– U.S. ––––, 130 S.Ct. 3322, 176 L.Ed.2d 1218, 78 USLW 3687 (U.S. May 24, 2010) (No. 09–893), in which the Ninth Circuit held that under California law an arbitration agreement containing a class-action waiver was unconscionable where the dispute was over a "predictably small" amount of damages, about $30 in tax charged on cell phones that were advertised as free. The

Illinois cases relied on by Plaintiffs similarly involve damages much smaller than that at issue here.

In *Keefe v. Allied Home Mortg. Corp.,* 393 Ill.App.3d 226, 332 Ill.Dec. 124, 912 N.E.2d 310, 313 (Ill.App.Ct.2009), for example, a borrower sued a mortgage broker for allegedly inflating the fees for certain services. The broker sought to compel arbitration, but the plaintiff argued that a class-action waiver in the arbitration agreement made it cost-prohibitive to arbitrate her claim, and thus rendered the agreement unconscionable. *Id.* at 318. Accepting that argument, the Court reasoned, "[t]he plaintiff in this case has alleged that defendants charged her $50 for a service that actually cost $4. This amounts to a $46 claim." *Id.* at 319. Although the plaintiff sought punitive damages as well, the court noted that there was no guarantee she would receive them, and any punitive damage recovery would be limited by her actual damages. *Id.* Further, the agreement at issue in *Keefe* did not reveal the cost of arbitration to the plaintiff, but it likely was between $25 and $240. *Id.* The court found that when it factored in attorney fees and the cost of marshaling evidence, the cost of bringing the claim would exceed any potential recovery. *Id.*

Similarly, in *Kinkel,* the court found that a class-action waiver was substantively unconscionable where it would have cost each cell phone customer $125 to arbitrate a dispute over a $150 early-termination fee. *Kinkel,* 306 Ill.Dec. 157, 857 N.E.2d at 267. The *Kinkel* Court also considered the fact that the costs of arbitration were not disclosed to the plaintiff. *Id.* And it noted that the nature of the claim was difficult for an individual customer to discern and litigate because it was based on an unreasonably large liquidated damage provision in a cell phone contract. *Id.* at 267–68.

Here, the cost of arbitration is clear. Both versions of the arbitration agreement signed by Plaintiffs provide that Corinthian will pay for the costs of arbitration in excess of a court filing fee. Further, Plaintiffs' claim is essentially that they did not get what they paid for from Defendants or were charged in excess of what they agreed to pay. As the

*Kinkel* court observed, this is the type of claim an average consumer can be expected to recognize without the assistance of counsel. *Id.*

Finally, and most importantly, it is far from clear that it would be cost-prohibitive for Plaintiffs to arbitrate their claims. Not only is the amount of damages at stake here relatively large compared to cases in which such arbitration agreements have been invalidated, but the Seventh Circuit has held that the party seeking to avoid arbitration bears the burden of providing "individualized evidence" that arbitration is cost-prohibitive. *Livingston v. Assocs. Fin., Inc.,* 339 F.3d 553, 557 (7th Cir.2003); *see also O'Quinn,* 2010 WL 4932665, at *6 (granting motion to compel arbitration where plaintiff failed to present evidence he was unable to pay costs of arbitration). Here, the Plaintiffs offer no such individualized evidence. The Court additionally notes that attorney's fees are recoverable under the Consumer Fraud Act, 815 ILCS 505/10a(c), and Corinthian's Arbitration Agreements provide that any remedy available from a court also will be available in arbitration.

**\*7** As such, the court finds that the class-action waiver and the Arbitration Agreements themselves are not substantively unconscionable. Because the degree of procedural unconscionability present is not enough to invalidate the arbitration agreements, the case should proceed to arbitration.

## V. *CONCLUSION*

For the reasons stated herein, the Court grants Defendants' Motion to Compel Individual Arbitration and Stay the Proceedings.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1118942

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2038348
Only the Westlaw citation is currently available.
United States District Court,
E.D. Wisconsin.

Mia B. SCAFFIDI, Plaintiff,

v.

FISERV, INC., Defendant.

No. 05-C-1046.   |   July 20, 2006.

**Attorneys and Law Firms**

Mia B. Scaffidi, Mequon, WI, pro se.

John R. Sapp, Miriam S. Fleming, Kristi S. Nelson
Foy, Michael Best & Friedrich LLP, Milwaukee, WI, for
Defendant.

### ORDER

J.P. STADTMUELLER, District Judge.

**\*1** On October 3, 2005, *pro se* plaintiff Mia B. Scaffidi
filed a complaint alleging claims of sex discrimination and
retaliation against her former employer, defendant Fiserv, Inc.
("Fiserv"). On December 1, 2005, Fiserv filed a motion to
compel arbitration and dismiss the complaint based upon an
arbitration agreement that Scaffidi signed before she began
her employment with Fiserv. Because Scaffidi agreed to
arbitrate claims of sex discrimination and retaliation, the court
will grant the motion to compel arbitration and dismiss the
complaint.

### BACKGROUND

Fiserv is a Wisconsin corporation that engages in interstate
commerce by providing technology, products, and services
to the financial marketplace. Scaffidi began working for
Fiserv on October 1, 2001, as an Assistant Vice President
in its Corporate Marketing Department. Scaffidi resides in
Wisconsin and worked for Fiserv in Wisconsin. Before
Scaffidi began working, she signed a Mutual Agreement
to Arbitrate Claims with Fiserv. (Swartz Decl. Ex. A)
("Arbitration Agreement"). Pursuant to the agreement,
Scaffidi and Fiserv agreed to arbitrate certain claims,
including sex discrimination claims. (*See id.* at 1.) Fiserv

terminated Scaffidi's employment in June 2004. On February
17, 2005, Scaffidi filed a charge of discrimination with
the EEOC. Fiserv participated in the EEOC's investigatory
process. On July 6, 2005, the EEOC dismissed Scaffidi's
charge and issued her a right to sue letter. In addition to
participating in the EEOC's investigatory process, Scaffidi
and Fiserv attempted to mediate Scaffidi's claims with the
assistance of the Honorable Patrick Snyder on November 23,
2004, and again in September 2005, but the mediation did
not result in settlement. On October 3, 2005, Scaffidi filed a
complaint in this action alleging claims of sex discrimination
and retaliation. On November 9, 2005, Fiserv sent Scaffidi
a letter demanding that Scaffidi arbitrate the claims in the
complaint. Scaffidi refused, and Fiserv filed a motion to
compel arbitration and dismiss the complaint on December 1,
2005. The motion is fully briefed.

### ANALYSIS

A party can be compelled to arbitrate only if the party
has agreed to arbitrate the dispute. *AT & T Technologies,
Inc. v. Communications Workers of America,* 475 U.S. 643,
648 (1986) ("[A]rbitration is a matter of contract and a
party cannot be required to submit to arbitration any dispute
which he has not agreed so to submit.") (citation omitted).
The question of arbitrability, i.e. whether the parties agreed
to arbitrate and whether the dispute falls within the scope
of the agreement, is to be decided by the court, not the
arbitrator, unless the parties clearly and unmistakably assign
the determination of arbitrability to the arbitrator. *See EEOC
v. Waffle House, Inc.,* 534 U.S. 279 (2002); *First Options of
Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (1995); *AT &
T Technologies,* 475 U.S. at 649; *Sharif v. Wellness Intern.
Network, Ltd.,* 376 F.3d 720, 726 (7th Cir.2004); *Air Line
Pilots Ass'n v. Int'l v. Midwest Express Airlines, Inc.,* 279 F.3d
553, 555 (7th Cir.2002). On the other hand, the arbitrator, not
the court, decides whether prerequisites to arbitration, such
as time limits, notice, laches, estoppel, and other conditions
precedent to arbitrability, have been met. *Howsam v. Dean
Witter Reynolds, Inc.,* 537 U.S. 79, 84-85 (2002).

**\*2** In this case, the parties did not agree to arbitrate the
question of arbitrability, so the court decides whether the
parties formed an agreement to arbitrate and whether the
plaintiff's dispute falls within the scope of the arbitration
agreement. *First Options of Chicago,* 514 U.S. at 943 (stating
that the federal court should apply the state law that ordinarily
governs the formation of contracts). Scaffidi argues that the

parties did not form an agreement to arbitrate because (1) the arbitration agreement lacked choice-of-law provisions at the time that Scaffidi signed the agreement; (2) the signature of Fiserv's human resources manager was not sufficient to bind Fiserv to the arbitration agreement; and (3) the arbitration agreement is not supported by adequate consideration. Each of the plaintiff's arguments lacks merit.

A contract may fail for indefiniteness if the contract lacks essential terms, *see* E. Allan Farnsworth, Contracts § 3.27 (3d ed.1999), but a choice-of-law provision is not an essential term because the parties need not specify the law that they wish to govern their contractual rights and duties. *See* Restatement (Second) Conflict of Laws § 188 (1971). Therefore, even if the arbitration agreement contained no choice of law provision, the agreement would still be effective. Moreover, the plaintiff is a Wisconsin resident, the defendant is a Wisconsin corporation, and the plaintiff worked for the defendant in Wisconsin. Even if Fiserv added provisions that Wisconsin law would govern the contract, the plaintiff does not contend that she expected any other state law to govern the arbitration agreement or that this court should apply the law of any state other than Wisconsin.

An arbitration agreement need not be signed. *Tinder v. Pinkerton Security,* 305 F.3d 728, 736 (7th Cir.2002). Therefore, the arbitration agreement would be effective even if no Fiserv representative signed it. In this case, the unsigned arbitration agreement that was tendered to the plaintiff was Fiserv's offer to bind itself to arbitration in exchange for the plaintiff's promise to do the same. A valid written offer need not contain a signature. Relatedly, Scaffidi does not contend that her own signature was forged or otherwise dispute that she assented to the agreement.

The arbitration agreement is supported by adequate consideration. Scaffidi argues that Fiserv "is bound by nothing." (Scaffidi Br. 9, Dec. 19, 2005.) Scaffidi argues that Fiserv's promise to arbitrate claims is illusory. (*Id.* at 11.) A claim of missing consideration is a question of arbitrability that is to be decided by the court, not the arbitrator. *See* Gibson v. Neighborhood Health Clinics, Inc., 121 F.3d 1126 (7th Cir.1997). Consideration for one party's promise to arbitrate can be the other party's promise to do the same. *Tinder,* 305 F.3d at 734; *Gibson,* 121 F.3d at 1131. In this case, the arbitration agreement contains Fiserv's promise to arbitrate certain claims. (*See* Arbitration Agreement at 1) ("The parties agree to submit to arbitration any and all disputes arising from or related to certain compensation matters and claims of

discrimination or sexual harassment during the employment relationship ....") The agreement itself is entitled, "*Mutual* Agreement to Arbitrate Claims." (*See* Arbitration Agreement at 1) (emphasis added). The arbitration agreement also states, "Each party's promise to resolve claims by arbitration in accordance with the provisions of this Agreement, rather than through the courts, is consideration for the other party's like promise." (*See* Arbitration Agreement at 1.) The arbitration agreement is supported by adequate consideration.

**\*3** Scaffidi argues that even if she agreed to arbitrate her claims, the arbitration agreement is unenforceable because it is unconscionable and a contract of adhesion. Scaffidi argues that the arbitration agreement is unconscionable because it is a form contract, offered on a take-it-or-leave-it basis, and Scaffidi had to sign it if she wanted the possibility of a job with Fiserv. (Scaffidi Br. 12.)

There is nothing inherently unconscionable about form contracts. *See* Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 593 (1991) ("[W]e do not adopt the Court of Appeals' determination that a nonnegotiated forum-selection clause in a form ticket contract is never enforceable simply because it is not the subject of bargaining ."). With respect to arbitration agreements and provisions, the Seventh Circuit has held that "[s]tandard-form agreements are a fact of life," Oblix, Inc. v. Winiecki, 374 F.3d 488, 491 (7th Cir.2004), and unconscionability arguments have been "rejected in this circuit as often as [they have] been raised." *Id.; see* Carbajal v. H & R Block Tax Services, Inc., 372 F.3d 903, 905-06 (7th Cir.2004) ("Is enforcement of this clause unconscionable? How could it be? Arbitration is just a forum; people may choose freely which forum will resolve their dispute.") In this case, Scaffidi argues that the arbitration agreement does not require Fiserv to arbitrate all claims that it may have against its employees, but that does not matter. *See* Oblix, 374 F.3d at 491 ("That Oblix did not promise to arbitrate all of its potential claims is neither here nor there.") Scaffidi argues that she is forced to surrender rights guaranteed to her in federal anti-discrimination statutes, but the arbitration agreement does not require her to surrender any substantive rights. *See* Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 123 (2001) ("The Court has been quite specific in holding that arbitration agreements can be enforced under the [Federal Arbitration Act] without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law."); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991) ("[B]y agreeing to arbitrate a statutory

Case: 1:15-cv-05601 Document #: 10-2 Filed: 10/15/15 Page 24 of 25 PageID #:107
Scaffidi v. Fiserv, Inc., Not Reported in F.Supp.2d (2006)

Exhibit 2

claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.")

Scaffidi argues that the arbitration agreement contains onerous terms that limit discovery, preclude judicial review of the arbitrator's decision, and bar the plaintiff from recovering attorney's fees that are authorized by statute. Under Wisconsin law, unconscionability is a contract defense that requires a showing of both procedural and substantive unconscionability. *Discount Fabric House of Racine, Inc. v. Wisconsin Tele. Co.,* 345 N.W.2d 417, 425 (1984). A contract term is substantively unconscionable if it is one-sided and creates an unfair advantage to one party. *See Wisconsin Auto Title Loans, Inc. v. Jones,* 696 N.W.2d 214, 219-20 (Wis.Ct.App.2005). The limits on discovery and the "binding" nature of the arbitrator's decision apply equally to Fiserv and Scaffidi and, therefore, create no unfair advantage to Fiserv. Limits on discovery in arbitration are permissible. *Gilmer,* 500 U.S. at 31 (stating that the plaintiff had not shown that he lacked a "fair opportunity to present [his] claims"). Moreover, limited discovery does not present a question of arbitrability and is an issue appropriately decided by an arbitrator. *See Kristian v. Comcast Corp.,* 446 F.3d 25, 42-43 (1st Cir.2006). Scaffidi argues that the provision, "the arbitrator's decision will be final and binding upon the parties," is unconscionable, but she does not support her argument with any legal authority and the court can find none. With respect to attorney's fees, the arbitration agreement refers only to costs, not attorney's fees: "Each party shall be responsible for its own costs incurred preparing for and participating in arbitration. The costs and fees of the arbitrator, the record, and of the AAA shall be borne by Fiserv." (Arbitration Agreement ¶ 15.) This provision, like the other provisions that Scaffidi highlights, is not unreasonably favorable to Fiserv and is not overly harsh; it does not prevent the arbitrator from awarding Scaffidi attorney's fees if she prevails on her claims. In any event, the arbitrator, not the court, must determine the validity of ancillary provisions such as cost provisions. *Carbajal,* 372 F.3d at 906.

**\*4** Even if the arbitration agreement is valid and enforceable, Scaffidi argues that Fiserv did not comply with contractual time limitations for demanding arbitration. (Scaffidi Br. 16-17.) However, the arbitrator, not the court, decides whether prerequisites to arbitration, such as time limits, have been met. *Howsam,* 537 U.S. at 84-85. Scaffidi also argues that Fiserv waived its right to arbitration by

participating in mediation and in the EEOC investigatory process. (Scaffidi Br. 17.) Although *Howsam* stated that waiver and delay are also issues for an arbitrator, *Howsam,* 537 U.S. at 84 ("[T]he presumption is that the arbitrator should decide "allegation[s] of waiver, delay, or a like defense to arbitrability."), courts interpreting *Howsam* have split on the issue of whether waiver should be determined by the court or the arbitrator. *Compare Nat'l Am. Ins. Co. v. Transamerica Occidental Life Ins. Co.,* 328 F.3d 462, 466 (8th Cir.2003) (holding that waiver is presumptively an issue for the arbitrator and not for the courts); *Bellevue Drug Co. v. Advance PCS,* 333 F.Supp.2d 318, 324 (E.D.Pa.2004) (same), *with Marie v. Allied Home Mortgage Corp.,* 402 F.3d 1, 11-14 (1st Cir.2005) (holding that waiver by conduct, at least where due to litigation-related activity, is presumptively an issue for the court); *Carbajal v. Household Bank, FSB,* 2003 WL 22159473, at \*8-9 (N.D.Ill. Sept. 18, 2003) (same). This issue of law makes no difference in this case. Even if the waiver issue were for the court to decide, Fiserv did not waive its right to arbitrate. The court will find a waiver if "based on all the circumstances, the party against whom the waiver is to be enforced has acted inconsistently with the right to arbitrate." *Grumhaus v. Comerica Securities, Inc.,* 223 F.3d 648, 650-51 (7th Cir.2000) (quotation omitted). Fiserv did not waive its right to arbitrate by participating in the EEOC investigatory process. *See Marie,* 402 F.3d at 16 ("[A]n employer cannot waive its right to arbitration by failing to raise the arbitration defense with the EEOC or by failing to initiate arbitration during the pendency of the EEOC proceedings."); *Brown v. ITT Consumer Fin. Corp.,* 211 F.3d 1217, 1222-23 (11th Cir.2000); *Gonzalez v. GE Group Adm'rs, Inc.,* 321 F.Supp.2d 165, 171-72 (D.Mass.2004); *Hankee v. Menard, Inc.,* 2002 WL 32357167, at \*5 (W.D.Wis.Apr.15, 2002); *DeGroff v. Masco Tech Forming Techs.,* 179 F.Supp.2d 896, 913 (N.D.Ind.2001). Fiserv was under no obligation to make a pre-suit demand for arbitration. *See Brown,* 211 F.3d at 1223. Moreover, "[p]reliminary negotiations concerning a settlement are not sufficient to waive arbitration." *Dickinson v. Heinold Securities, Inc.,* 661 F.2d 638, 641 (7th Cir.1981). Fiserv did not waive its right to arbitrate by engaging in settlement discussions or mediation efforts. *See id.* (eighteen month delay that occurred while attempting to settle dispute does not work as a waiver to arbitration). Fiserv demanded arbitration approximately one month after Scaffidi filed suit in federal court and before it filed an answer. Because Fiserv did not delay or act in a manner inconsistent with an intent to arbitrate, no waiver occurred. *See Welborn Clinic v. MedQuist, Inc.,* 301 F.3d 634, 637 (7th Cir.2002) (finding

no waiver where defendant moved to compel arbitration less than two months after suit was filed).

 **\*5** Scaffidi does not contest that her claims of sex discrimination and retaliation fall within the scope of the arbitration agreement nor could she. (Arbitration Agreement at 1) ("[T]he claims covered by this Agreement include ... discrimination claims, including but not limited to ... sex.")

Because Scaffidi agreed to arbitrate claims of sex discrimination and retaliation, the court will grant the motion to compel arbitration. Because all of Scaffidi's claims are arbitrable, the court will dismiss this action. *See, e.g., Deputy v. Lehman Bros., Inc.,* 374 F.Supp.2d 695, 711 (E.D.Wis.2005) ( "A court may dismiss a case if all of the issues raised before it are arbitrable.").

Accordingly,

**IT IS ORDERED** that the defendant's motion to compel arbitration and dismiss the complaint be and the same is hereby **GRANTED;**

**IT IS FURTHER ORDERED** that the action be and the same is hereby **DISMISSED.**

The clerk is directed to enter judgment accordingly.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2038348

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.